77 P.2d 634

## NEW MEXICO PRODUCTS CO. v. NEW MEXICO POWER CO. et al.

No. 4201.

Supreme Court of New Mexico.

Aug. 13, 1937.

Rehearing Denied March 30, 1938.

Wheaton Augur and J. O. Seth, both of Santa Fe, for appellant.

Francis C. Wilson, John C. Watson, and Earl D. Kenney, all of Santa Fe, for appellees.

HUDSPETH, Chief Justice.

This is a suit for damages brought by New Mexico Products Company, appellant here, against the New Mexico Power Company and city of Santa Fe, appellees, because of the obstruction of the flow and appropriation of waters of Santa Fe creek which appellant and its predecessors in title had put to beneficial use since the year 1885 in the irrigation of 80 acres of land.

The facts alleged in the amended complaint or stipulated in so far as are necessary to be stated follow: That between the years 1603 and 1614 a Spanish settlement was established on the site now occupied by the city of Santa Fe through which ran, as through said city now runs, the Santa Fe creek, which said creek was for said Spanish settlement, as it now is for said city, the source of water supply for the inhabitants; that Santa Fe was from date of its establishment and throughout the Spanish and Mexican rule the seat of the several governments under which the territory of the present state of New Mexico was ruled; that the pueblo of Santa Fe and all the territory involved herein was ceded to the United States by the Treaty of Guadalupe Hidalgo, and since the American military occupation it has been the seat of government of the territory now embraced in the state of New Mexico; that the present inhabitants of the city of Santa Fe are descendants of the inhabitants of the pueblo at the time of the change from Mexican to American sovereignty, together with others who have joined and have been received into said settlement, now city; and that such inhabitants numbered more than 3,000 in the years 1889 and 1891.

The waters of Santa Fe creek have never been generally adjudicated pursuant to 1929 Comp.St., c. 151, art. 1, and appellant did not join as parties, nor endeavor so to join all whose claims to the use of such waters are of record.

"That during the period that said settlement was under the domain of the Spanish Crown, and during the subsequent period

that it was under Mexican rule, said settlement was organized and governed according to the form prescribed and observed by said sovereignties respectively, as a Spanish, and later a Mexican, quasi municipal corporation, having a governing body, variously known and designated, and often referred to as, and possessing the functions of 'Cabildo' or 'Ayuntamiento,' and having a presiding or executive officer generally known and referred to as 'Alcalde.'"

That the appellee New Mexico Power Company furnished for profit water to the citizens of Santa Fe and to the city of Santa Fe and has for its source of supply of water the Santa Fe creek; that the reservoir and the system of the New Mexico Power Company are located on or near said Santa Fe creek above the point at which the ditches from which the lands of appellant are irrigated join said stream; that the appellee New Mexico Power Company is operating under the terms of a certain franchise passed by the city council of the city of Santa Fe on the 22d of December, 1925; that in said ordinance the said appellee New Mexico Power Company is directed within a period of eighteen months to construct additional reservoir sufficient to satisfy the needs of the city based upon a population of 10,000 people and on an average consumption of 125 gallons per capita. As further provided, New Mexico Power Company shall insure *"so far as feasible the normal flow in the channel of the Santa Fe River to the extent of valid existing prior private rights therein."* On the 9th day of November, 1925, application for a permit, the rights of which were subsequently acquired by the New Mexico Power Company, was made to the state engineer of the state of New Mexico, for the right to take and divert all surplus waters of the Santa Fe creek; that thereafter, on·the 14th day of July, 1926, a permit was granted by the state engineer to the New Mexico Power Company to take and divert 3,500-acre feet of water upon the express condition that such diversion *"is not to be exercised to the detriment of any others having valid prior and existing rights to the use of water of this stream system."* That said New Mexico Power Company, pursuant to said ordinance and said permit, constructed said additional dam and reservoir in the Santa Fe Canyon; that the population of the city of Santa Fe was 7,236 persons in the year 1920, 11,176 in 1930, and about 13,000 during the summer season in the year 1935 when this suit was commenced; that the supply of water in Santa Fe creek varies materially from year to year.

"(a) That the conditions set forth in Paragraph 15a of the amended complaint as to the nature of the water supply, as to its variable sufficiency and as to the conduct or practice of defendant New Mexico Power Company in intercepting the flow, have existed since the year 1927;

"(b) That the physical control of the water flow in question, by defendant New Mexico Power Company, as set forth in Section II, paragraph (1) of the original stipulation, has existed since the year 1927;

"(c) That in the year 1927 defendant New Mexico Power Company erected and completed its dam and reservoir, in compliance with the ordinance of December 22, 1925, and to the satisfaction of defendant City of Santa Fe; that by means thereof it was able to exercise and did exercise control of the water flow as alleged and stipulated; and that no additions were made thereto, nor enlargements of diverting or storing capacity made, until the year 1935, in which year the height of said dam was increased six feet, said enlargement having been completed on or about September first of that year."

In some years the supply is sufficient to fill and to maintain filled the reservoir of the New Mexico Power Company and still leave a surplus available to the appellant for the irrigation of its lands. In other years the New Mexico Power Company through its dams and reservoirs intercepts the entire flow of the stream and diverts to its own use all of the waters so captured and stored; that the amount of water so captured and stored and so diverted and sold to customers of New Mexico Power Company has increased to a great degree; that during the years 1931, 1932, 1933, 1934, and 1935 such increased consumption has from time to time and from year to year materially and substantially decreased the flow in the Santa Fe creek below the reservoir of the New Mexico Power Company and that by reason of such decreased flow the water available for the irrigation of appellant's land has been likewise materially reduced; that during the years 1931 and 1932 there was only water available for two irrigations in the early spring of about 10 acres of appellant's land, and that there was no other available water except during periods of excess rainfall during the latter part of the summer; that during the year 1933 a small runoff in the spring was used by appellant in irrigating 10 acres and that thereafter no water was available for irrigation of appellant's land except during periods of excess rainfall; that during the year 1934 there was no flow in the stream below the reservoir of New Mexico Power Company and there was no water in Santa Fe creek available for irrigation of appellant's land; that during the year 1935 the runoff of water was substantial and that appellant was able to irrigate 16 acres of its land up to June, but that no perennial flow was available thereafter for the irrigation of said lands and the appellant had to depend upon wells; that the said New Mexico Power Company has damaged and impaired for the years 1931 to 1935, inclusive, appellant's water rights with respect to said lands. That said damage and impairment are continuous wrongs and injuries, impairing and damaging from year to year and from season to season, the use of said lands for irrigation purposes to which the said appellant has used said lands and intends to use them, and that the crops and produce of the said lands of the said appellant for the years set forth are damaged to the extent and in the manner set forth in paragraph 16 of amended complaint.

Demurrers were sustained on 4 grounds. Plaintiff having announced that it would

stand on its amended complaint, judgment of dismissal was entered. This appeal followed.

■ The first assignment of error challenges the correctness of the trial court's ruling that the "pueblo right" as defined in City of San Diego v. Cuyamaca Water Co. et al., 209 Cal. 105, 287 P. 475, Los Angeles Farming & Milling Co. v. Los Angeles, 217 U.S. 217, 30 S.Ct. 452, 454, 54 L.Ed. 736, and other California cases, obtains in this state—the court held in effect that the city of Santa Fe had the right—regardless of the prior appropriation and beneficial use by others—to take from the Santa Fe creek from time to time all the water that may be needed at such time for the use of the inhabitants of said city and for all municipal and public uses and purposes therein.

Appellant urges that the later California cases are without precedent in Spanish law; that the California cities succeeded by legislative grants and charters to the rights of the Mexico pueblos, while our Constitution and laws, beginning with the Act of July 20, 1851, are in conflict with the pueblo right and evidence a policy contrary to that doctrine. And lastly, that the said pueblo right was never conferred upon the Villa de Santa Fe, since there was no grant, hence the city of Santa Fe has no pueblo right. We find it convenient to consider only the last proposition. In State ex rel. Community Ditches v. Tularosa Com. Ditch, 19 N.M. 352, 143 P. 207, 215, we said:

"Nor can such exclusive right be sustained, under what was known under the Spanish and Mexican laws and customs as a 'pueblo right,' the origin, nature, and character of which will be found fully discussed, by Kinney on Irrigation and Water Rights (2d Ed.) § 581 et seq. The author says: 'At first the plan for the establishment of these pueblos was for the King of Spain, in each case by special ordinance, to provide for the foundation of the pueblo, and to set apart for the use of the pueblo and its inhabitants a certain area of land, and to prescribe in the ordinance the rights of the pueblo and its inhabitants to the use of the waters flowing to those lands.' "

In Los Angeles Farming & Milling Co. v. Los Angeles, supra, it was stated:

"The case was submitted to the court of original jurisdiction upon a stipulation of facts, which shows that the pueblo of Los Angeles was established in 1781 under the government of Spain, containing 4 square leagues of land, embracing the lands afterwards patented to the city under the act of Congress of March 3, 1851; that the settlers and inhabitants of the pueblo used the water from the river by means of ditches for domestic and irrigation purposes until the time of the acquisition of the state of California by the United States, the amount of irrigable land being then about 1,500 acres, and it is stipulated: 'Under the laws of the Kingdom of Spain, said pueblo, upon its foundation, *by virtue of a grant* under such

laws, had the paramount right, claimed by the plaintiff in the complaint herein, to use all the water of the river, and such paramount right continued to exist under that government and under the Mexican government, until the acquisition of California by the United States.' * * * It is thus apparent that the supreme court of California put the decision of the case upon the effect of the old Spanish or Mexican law as to the rights of the pueblo, succeeded to by the city, and confirmed by proceedings under the acts of Congress for the purpose of confirming such titles. * * * The act of 1851 (9 Stat. at L. 631, chap. 41), § 14, made provision for the presentation to the commission of the former right of pueblos, and the issue of patents to them upon confirmation. And further, the same section provided that the existence of a city, town, or village on July 7, 1846, being duly proved, should be prima facie evidence of a grant to such corporation. * * * But as these alleged rights and limitations arise under the act of March 3, 1851, which this court has repeatedly held did not originate Federal rights or titles, but merely confirmed the old ones, we cannot review the judgment of the state court in this respect." (Italics ours.)

Reference is made to grants as the source of the water rights called the "pueblo right" in numerous California cases, such as Lux v. Haggin, 69 Cal. 255, 4 Cal. 919, 10 P. 674; Devine v. Los Angeles, 202 U.S. 313, 26 S.Ct. 652, 50 L.Ed. 1046; Vernon Irrigation Co. v. Los Angeles, 106 Cal. 237, 39 P. 762; Hihn Co. v. Santa Cruz, 170 Cal. 436, 150 P. 62.

In United States v. Santa Fe, 165 U.S. 675, 17 S.Ct. 472, 41 L.Ed. 874, the right of Santa Fe to the lands upon which it is situated was litigated. In that case, speaking through Mr. Chief Justice White, the court said:

"In 1680 the Spaniards were driven out by an Indian insurrection, and Santa Fé was destroyed, the Spaniards retreating to Paso del Norte, where they remained until 1692, when Diego de Vargas reconquered the country. In 1693 De Vargas re-established Santa Fé. From that time to the American occupation—although the record does not fix the precise character of the municipal government—there is no doubt that there was a settlement on the site of the old villa of Santa Fé, and that it was also the capital of the province. In 1851 Santa Fé was incorporated, and its boundaries defined by act of the territorial legislature of New Mexico. Laws N.M.1851–52, Kearney's Code, 112. The municipal charter granted in 1851 was shortly thereafter repealed, and the probate judge of the county became, by operation of law, the custodian of the records of the corporation, and was a trustee to wind up its affairs. Id. 272. No municipal body existed from this time until the year 1891, when Santa Fé was again organized pursuant to the laws of New Mexico. * * * The petition originally filed on behalf of the city, after setting out the existence of the Spanish villa known as 'La Villa de Santa Fé,' substan-

tially averred that the municipality of Santa Fé occupied the situs of the Spanish villa, and possessed jurisdiction over the same territory, and therefore was, in law, the successor to all the rights enjoyed by the Spanish villa. It alleged that prior to· the Indian insurrection in 1680 the villa had received a pueblo grant of four square leagues of land, the central point of which was in the center of the plaza of the city of Santa Fé; that the grant was made by the King of Spain; that juridical possession was given thereunder, and that such facts were evidenced by a valid testimonio; that the archives and records of the villa were destroyed in the Indian insurrection of 1680, and therefore the title could not be produced. * * This amended petition substantially reiterated the averments of the original petition as to the foundation and existence of the villa of Santa Fé, but omitted the allegations on the ·subject of an express grant to La Villa de Santa Fé, the delivery of juridical possession thereunder, and the issuance of a testimonio. The allegation on these subjects was that prior to the insurrection in 1680, 'La Villa de Santa Fé was entitled to, and had, under the laws of the kingdon of Spain, in force in that territory at that time, a municipal or pueblo grant, conceding to and vesting in said Spanish town or villa a certain tract of land containing four square Spanish leagues.' The positive averment in the original petition as to the destruction during the insurrection of 1680 of the evidence showing the existence of an express

grant was replaced by a qualified averment that 'all the muniments of title of such municipal grant, *if any such existed,* were utterly destroyed by the hostile Indians engaged in such insurrection.' * * * As the right which the city asserts is devoid of every element of proof tending to show a possession coupled with claim of title, but rests upon the mere assumption of a right asserted to have arisen by operation of law hundreds of years ago, of course there is no room for the application of a presumption of an actual grant, within the doctrine declared in United States v. Chaves, 159 U.S. 452, 16 S.Ct. 57 [40 L.Ed. 215]. Even did the case present a claim of express grant, proof of the existence of which rested on presumptions arising from acts of possession, etc., there are many circumstances attending the history of Santa Fé, and the nature of its establishment, which we have heretofore recited, which would strongly tend to rebut the presumption. The town was, it would seem, originally a colony of deserters from the Spanish army which was located in the midst of the native Indians. It became afterwards the capital seat of the province, and a fortified town, and was presumably, in its permanent creation, the outcome and development of the success of the Spanish arms, rather than of the exercise of the power to induce settlements by contracts with individuals or otherwise. It is impossible, on the theory of the petitioner, to explain the petition presented by the city to the Spanish governor, in 1715, for a concession of

a tract of swamp land situated within the four square leagues now claimed, for, if the right to the entire four square leagues then existed, it was complete. At the time of this petition, if the claim here advanced had any foundation, or was deemed by any one to exist, such fact would, of course, have been then known, and have rendered the petition for the grant of the swamp wholly unnecessary. * * * It cannot be doubted that under the law of Spain it was necessary that the proper authorities should particularly designate the land to be acquired by towns or pueblos before a vested right or title to the use thereof could arise."

It appears to have been definitely settled by this decision that there was no grant made by the Spanish King to the Villa de Santa Fe. Without a grant, the Villa de Santa Fe had no pueblo right. We have found neither decision nor text suggesting that a mere colony of "squatters" could acquire under the Spanish law this extraordinary power over the waters of an entire nonnavigable stream known as "pueblo right," even though they were organized as a pueblo—which is the equivalent of the English word "town"—with a full quota of officers. The Supreme Court of the United States held, in effect, that the occupancy of the pueblo by the Spanish military and governmental authorities conferred no title on the inhabitants.

The next assignment of error is that the court erred in sustaining the demurrer upon the grounds that the court was without jurisdiction to entertain this action because the rights to the use of waters of the Santa Fe stream system had not been adjudicated, and that there was a defect of parties defendant. The demurrer states:

"That if the plaintiff has or owns any right to the use of waters of the Santa Fe Creek, which is not subject and inferior to the right of the inhabitants of defendant The City of Santa Fe, as set forth and claimed in paragraph II hereof, then: (a) That there is a defect of parties defendant, in that this is a suit for the determination of a right to use the waters of a stream system, and it appears that the rights to the use of the waters of said stream system have not been adjudicated in manner and form as by statute provided, and plaintiff has failed to make parties all those whose claim to the use of such waters are of record, or all or any other claimants so far as such other claimants can or could be ascertained with reasonable diligence, and has failed to allege any diligence or effort to ascertain who, besides himself and the named defendants, have record claims or make other claims to the use of such waters; and (b) The court has no jurisdiction of the subject of the action, being a right to use the waters of a stream system, which right is not based upon nor embodied in any decree generally adjudicating such right, to-wit all rights to the use of waters of the Santa Fe Creek."

The application of the water code, chapter 49, Laws of 1907, 1929 Comp.Stat. §

151-101 et seq., to water rights existing at the time of its enactment was considered by us in Pueblo of Isleta v. Tondre & Picard, 18 N.M. 388, 137 P. 86, and Harkey et al. v. Smith, 31 N.M. 521, 247 P. 550; also in El Paso & R. I. Ry. Co. et al. v. District Court, Etc., 36 N.M. 94, 8 P.2d 1064, 1068. In the latter case we said:

"This court has always recognized that the jurisdiction of the state engineer to control and administer appropriation and use is no broader than as expressed in or necessarily to be inferred from the statute./ In Vanderwork v. Hewes, 15 N.M. 439, 110 P. 567, it was held not to include waters seeping from an unknown source.( In Pueblo of Isleta v. Tondre, 18 N.M. 388, 137 P. 86, it was held not to include change of point of diversion by a community acequia. It was laid down, generally, that it does not embrace prior existing water rights. In Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, we recognized this limited jurisdiction. * * * In the opinion on rehearing in Pueblo of Isleta v. Tondre, supra, this court, though adhering to the view that prior existing water rights were not brought within the general provisions of the water code, did admit the point that they were within its adjudication provisions, and that, once adjudicated, they became subject to the regulatory and administrative provisions of the statute and to the jurisdiction of the state engineer. This was held to be the correct view in Harkey v. Smith, 31 N.M. 521, 247 P. 550."

It is stipulated that the water rights of the stream system had not been adjudicated under the water code, but appellant's right was more than twenty years old when the code was enacted and this action falls within the exception. This is not to be taken as an intimation that such an action based upon a water right established after the enactment of the code would be subject to this demurrer. Compare Smith v. District Court, 69 Utah 493, 256 P. 539; Pacific Live Stock Co. v. Lewis (Oregon Water Board), 241 U.S. 440, 36 S.Ct. 637, 60 L.Ed. 1048; Humboldt Land & Cattle Co. v. Allen (D.C.) 14 F.2d 650.

The next assignment of error involves the statute of limitations. The court below ruled as follows:

"That the wrong, injury and damages upon which the plaintiff sues, if any such there was or were, appear upon the face of the complaint to have been done, suffered and to have been complete, and that plaintiff's cause of action therefore, if any he ever had, accrued more than four years prior to the commencement of this suit."

Appellant maintains that this case is not governed by the four-year statute of limitations, but by chapter 21 of Laws of 1923, 1929 Comp.Stat. §§ 43-301 and 43-302, which read as follows:

"Section 1. Any person, firm or corporation authorized by the constitution or laws of this State to exercise the right of eminent domain who has heretofore

taken or damaged or who may hereafter take or damage any private property for public use, without making just compensation therefor or ·without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation thereof, shall be liable to the owner of such property, or any subsequent grantee thereof, for the value thereof or the damage thereto at the time such property is or was 'taken or damaged, with legal interest, to the date such just compensation shall be made, in an action to be brought under and governed by the code of civil procedure of this state; Provided that this act shall not apply to or affect any telephone line, telegraph line, electric light or power transmission line.

"Sec. 2. The defendant or defendants to any such action may plead adverse possession as defined by section 3365 * * * of the New Mexico statutes annotated, codification of 1915, as a defense to said action, but no other statute of limitation shall be applicable or pleaded as a defense thereto."

It is admitted that the appellees may condemn water rights under the power of eminent domain. Section 3365 of the 1915 Code, 1929 Comp.Stat. § 83-122, reads as follows:

"No person or persons, nor their children or heirs, shall have, sue or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments, against any one having adverse possession of the same continuously in good faith, under color of title, but within ten years next after his, her or their right to commence, have or maintained such suit shall have come, fallen or accrued, and all suits, either in law or equity, for the recovery of any lands, tenements or hereditaments so · held, shall be commenced within ten years next after the cause of action therefor has accrued."

Appellee's brief states:

"Whether the taking or damaging be deemed complete or not, a matter to follow in the discussion, the property allegedly taken or damaged was a water right, a species of property intangible and incorporeal. The wrongdoing prevents water from reaching appellant's ditch. So it affects the right to use; not the water itself. Snow v. Abalos, 18 N.M. 681, 694, 140 P. 1044."

In the case of Snow v. Abalos, supra, we said:

"Such being the case, we are of opinion, that prior to the enactment of the statute of 1895, supra, making such community acequias corporations, for certain purposes, each individual water user under a community acequia was the owner of a right to take water from the public stream or source from which it was drawn, which right was divorced from and independent of the right enjoyed by his co-consumer; that the fact that such water was diverted into a ditch, owned in common with other water users, did not give such other users any interest in, or control over, the right to take water, or water right, which

each individual consumer possessed; that the right to divert water, or the water right, is appurtenant to specified lands, and inheres in the owner of the land; that the right is a several right, owned and exercised by the individual, and, the officers of the community acequia, in diverting the water act only as the agents of the appropriator. Section 44, c. 49, S.L.1907, provides: 'All water used in this territory for irrigation purposes, except as otherwise provided in this act, shall be considered appurtenant to the land upon which it is used.' "

The 1923 statute quoted above seems to be applicable. A water right is property and in fact it is held to be real property by most authorities.

"It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property." 2 Kinney on Irrigation and Water Rights (2d Ed.) p. 1328.

"The rules of the statute of limitations, as the same are applied to land, are also applied to water rights." 2 Kinney, p. 1332. See, also, Hammond v. Johnson (Utah) 66 P.2d 894; Murphy v. Kerr (District Court, D. New Mexico) 296 F. 536; Nielson v. Parker, 19 Idaho, 727, 115 P. 488; Wutchumna Water Co. v. Ragle, 148 Cal. 759, 84 P. 162; South Tule Indep. Ditch Co. v. King, 144 Cal. 450, 77 P. 1032. The ten-year period of this statute of limitations not having elapsed, it will not be necessary to consider other phases of the limitation statute.

Nor do the facts stipulated constitute abandonment under 1929 Comp. Stat. § 151-154. When water fails to reach the point of diversion without the fault of the appropriator and he is at all times ready and willing to put the water to the usual beneficial use, there is no forfeiture of his right for nonuser. Pioneer Irrigating Ditch Co. v. Blashek, 41 N.M. 99, 64 P.2d 388. The reservoir of appellee New Mexico Power Company was lawfully made under an ordinance which recognized the existence of prior rights for a lawful purpose after a permit was obtained from the state engineer to appropriate additional water with which to supply the city of Santa Fe and its inhabitants. Appellant had no right to anticipate a wrong or injury. Although the structure was permanent, it was not necessarily injurious. The cause of action was not the construction of the reservoir, but the irregular recurring wrongs in preventing the water from reaching appellant's ditch. Sanchez v. Atchison, T. & S. F. Ry. Co., 33 N.M. 240, 264 P. 960; Fuller v. Swan River Placer Min. Co., 12 Colo. 12, 19 P. 836; Commissioners of Aberdeen v. Bradford, 94 Md. 670, 51 A. 614; 37 C.J. 783 and 787; 67 C.J. 1055.

The city of Santa Fe demurred to the amended complaint on the ground, among others, that it was not liable for its torts in the exercise of its governmental function, and cites 4 McQuillen on Municipal Corporations, § 1807; 43 C.J., title, Municipal Corporations, §§ 179, 449, 1701, 1704, and other authorities. There is con-

fusion in the adjudicated cases as to what constitutes actionable wrongdoing on the part of a municipality and whether the making of the contract for water services is a delegation of a governmental function. City of Gadsden v. Mitchell, 145 Ala. 137, 40 So. 557, 6 L.R.A.,N.S., 781, 117 Am.St.Rep. 20; Allas v. Borough of Rumson, 115 N.J.Law, 593, 181 A. 175, 102 A.L.R. 648, and note. The tendency is to extend the liability of the municipality. Annotation 89 A.L.R. 394. It is, of course, within the power of the Legislature to fix the liability of municipalities and legislation appears on this subject in the statutes of many states. Our Legislature has provided that a municipal corporation shall be responsible for the torts of its officers "when done by authority of such municipal corporation, or in execution of the orders thereof." 1929 Comp.Stat. § 90-623.

The city of Santa Fe is asserting in this court title to all the water rights. The wrongful appropriation of the water of Santa Fe creek which prevented its use by appellant in the irrigation of its land was done in part for the benefit of the city of Santa Fe. "The city corporation ratified the act by defending it." 4 Dillon on Municipal Corporations (5th Ed.) p. 2875; 62 C.J. 1130; Warren v. New York Life Insurance Co., 40 N.M. 253, 58 P. 2d 1175. Where there is doubt as to whether the city is liable, the question will be resolved against the municipality. 43 C.J. 932; Schultz v. Phoenix, 18 Ariz. 35, 156 P. 75; Mayor, etc., of Birmingham v.

Starr, 112 Ala. 98, 20 So. 424; Pardini v. City of Reno, 50 Nev. 392, 263 P. 768.

We are constrained to hold that the amended complaint is sufficient to withstand the demurrers for the reasons stated, and the cause will be remanded to the district court with directions to overrule the demurrers. It is so ordered.

BICKLEY, BRICE, and ZINN, JJ., concur.

SADLER, Justice (specially concurring).

A question as to the relief sought by plaintiff in its amended complaint prompts me to explain my position on the subject of limitations. I agree with the opinion in its treatment and disposition of all other questions: I do not disagree with it on the question of limitations if, by its amended complaint, the plaintiff seeks only the damages recoverable under 1929 Comp. St. § 43-301, viz., such as are permanent in character, as I seriously doubt.

In its original complaint filed January 12, 1935, the invasion of its water rights was set back six years beginning with the cropping season of 1929. In that year and succeeding years, as alleged, only inadequate irrigation for small acreages was had until 1934, when none at all occurred. And so, following this historical treatment of the deprivations, in paragraph 17 of the original complaint, plaintiff alleges that because of said conditions the defendant New Mexico Power Company has dam-

aged and impaired plaintiff's water rights on said lands, "and that the damage and impairment to the said complainant's lands and water rights as above set forth are now *total* and *permanent*." (Italics mine.) Damages in the sum of $30,000 are laid.

Thereafter, the trial court sustained the joint demurrer of New Mexico Power Company and city of Santa Fe to the complaint as thus drawn. One ground of the demurrer was that plaintiff's action was barred by the four-year statute of limitations. Whereupon, under leave, the plaintiff amended his complaint and by stipulation the previous demurrer stood and was considered directed to the complaint as thus amended. So treated, it was again sustained. The amended complaint was filed November 22, 1935. In its historical statement of deprivations caused by defendants, the years 1929 and 1930 were dropped and, its filing extending beyond the current cropping season, the year 1935 was added.

It seems appropriate at this point to set out in full paragraph 17 of the complaint as amended. It reads:

"The complainant further shows that because of the conditions outlined above and because of the diversion of water of the said New Mexico Power Company from said creek into its said reservoirs and from its reservoirs through its system to those persons who shall pay it for the same, the said New Mexico Power Company has damaged and impaired for the years set forth the said complainant's water rights with respect to said lands. *That said damage and impairment. are continuing wrongs and injuries, impairing and damaging from year to year and from season to season,* the use of said lands for irrigation purposes to which the said complainant has used said lands and intends to use them *and that the crops and produce of the said lands of said complainant for the years set forth are damaged to the extent and in the manner set forth in the preceding paragraph.*" (Italics mine.)

While the allegation of "damage and impairment" of plaintiff's water rights persists, it is said to be only "for the years set forth" and such damage and impairment are characterized by plaintiff itself as "continuing wrongs and injuries," recurring "from year to year and season to season"; damaging the "crops and produce" of said lands to the extent and in the manner set forth. This sounds very much like the assertion of a claim for corp damage resulting from seasonal trespasses by defendants. If so, I think there can be no doubt that it is governed by the four-year statute of limitations. Eminent domain proceedings could not have been resorted to in the first instance to acquire the right so to trespass. Cf. Patterson v. Horsefly Irrigation Dist. (Or.) 69 P.2d 282, 283, 289. Nor may a statute (1929 Comp. § 43-301) authorizing recovery of damages, after the event, from any person, firm, or corporation empowered under the Constitution and laws of this state to exercise the right of eminent domain, who has "taken or damaged" pri-

vate property for public use, be made the basis of a recovery therefor.

This brings me to the point of disagreement with the majority, if I correctly understand their position. In so far as the opinion holds the ten-year statute of limitations applicable to damages claimed for a permanent taking or impairment of plaintiff's water rights, I think it is sound. If it embraces a holding, agreeable to the views of the Justices signing it, as I understand their position, that plaintiff can recover under section 43-301 damages of the kind its amended complaint seems to assert, recurring and seasonal in character, over a period of ten years prior to filing of the amended complaint, then I disagree with such a construction of the statute mentioned.

My view of said statute is that under it only such damages may be recovered as could have been awarded in eminent domain proceedings had they been resorted to in the first instance. This seems obvious from the fact that recovery must be against, and is confined to, a "person, firm or corporation authorized by the constitution or laws of this state to exercise the right of eminent domain who has heretofore taken or damaged * * * private property for public use without making just compensation therefor." The statute uses the very language "taken or damaged" found in the constitutional provision, article 2, § 20. As used in the Constitution and eminent domain statutes, no one would challenge the proposition that only permanent injury may be compensated

in such proceedings. See 2 Nichols on Eminent Domain (2d Ed.) § 312; 1 Lewis Eminent Domain (3d Ed.) § 363; Knowles v. New Sweden Irr. Dist., 16 Idaho, 217, 101 P. 81, 85; Stockdale v. Rio Grande Western Ry. Co., 28 Utah, 201, 77 P. 849; City of Lawton v. Johnstone, 92 Okl. 280, 219 P. 414. Do the words "taken or damaged" mean one thing in the Constitution and something else in a statute supplementary thereto? I do not think so.

The last-mentioned case, City of Lawton v. Johnstone, brings out clearly the distinction between a cause of action for permanent damage to realty and successive actions to recover damages for continuing and recurring trespasses in relation thereto. It is perhaps more accurate to speak of it as permanent "injury" rather than permanent "damage." Eminent domain proceedings provide recovery for permanent injury only. And the damages awarded therefor, once paid, transfer to the defendant title to the real estate, if there has been a complete taking, or some right or interest permanent in character in relation thereto, if defendant's title and possession remain undisturbed, leaving the property with a depreciated value thereafter. Cf. Knowles v. New Sweden Irr. Dist., supra. But sufficient proof that only permanent injury may be compensated in eminent domain proceedings (and as I insist under a statute such as ours, section 43-301, supplementing such proceedings) is furnished by the measure of damages applicable to the award of compensation, namely, the decrease in the market value of plaintiff's

land. 2 Nichols on Eminent Domain (2d Ed.) § 327.

The point to these observations is this: If the amended complaint is what it appears to be, an action for continuing trespass, seasonal in character, the plaintiff may not recover thereunder any damages accruing more than four years next before filing its amended complaint. It is then not an action under section 43-301 at all, but an ordinary action in damages for trespass. And sections 43-301, 43-302, may not be looked to for the purpose of supplying a ten-year period of limitation, when the damages sought are not of the kind contemplated by section 43-301, compensation for permanent injury to real estate.

As the amended complaint now stands, it seems nothing more than an ordinary action to recover damages for recurrent trespasses. So viewed, plaintiff should be limited at the trial to proof of such damage as occurred within four years prior to filing of the amended complaint. Counsel for defendants assert without contradiction or challenge on the part of plaintiff's counsel that at the trial "it was expressly conceded * * * that it was the four-year statute that is involved." The amended complaint reasonably bears an interpretation supporting such an assumption. The trial court having so interpreted it, and that interpretation being reasonable, we should adopt same here. Summerford v. Board of Commissioners, 35 N.M. 374, 298 P. 410. I think the amended complaint states a cause of action and is sufficient to withstand the demurrers

interposed against it. Hence, I agree with the prevailing opinion in remanding the cause to the district court with directions to overrule the demurrers.